**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RAYMOND M. CORNWELL,
          *Plaintiff-Appellant,*

v.

ELECTRA CENTRAL CREDIT UNION;
JAMES E. SHARP,
          *Defendants-Appellees.*

No. 04-35408

D.C. No.
CV-03-00699-GMK

OPINION

Appeal from the United States District Court
for the District of Oregon
Garr M. King, District Judge, Presiding

Argued and Submitted
September 14, 2005—Portland, Oregon

Filed March 1, 2006

Before: Raymond C. Fisher, Ronald M. Gould,
Carlos T. Bea, Circuit Judges.

Opinion by Judge Gould;
Concurrence by Judge Bea

**COUNSEL**

Craig A. Crispin, Crispin Employment Lawyers, Portland, Oregon, for the plaintiff-appellant.

Richard R. Meneghello (argued), Fisher & Phillips, LLP, Portland, Oregon; Karen E. Saul (argued) and Kimberley Hanks McGair, Farleigh, Wada & Witt, PC, Portland, Oregon, for the defendants-appellees.

**OPINION**

GOULD, Circuit Judge:

Plaintiff-Appellant Raymond Cornwell appeals the district court's order granting summary judgment to defendants-appellees Electra Central Credit Union and Jim Sharp, and dismissing Cornwell's retaliation and race discrimination claims under 42 U.S.C. § 1981, Title VII, and Oregon law. Cornwell also appeals the district court's order denying his motion to reopen discovery so that Cornwell could depose an additional witness to oppose summary judgment. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm in part and reverse in part.

**I[1]**

---

[1]Because we are reviewing a district court's order granting summary judgment, our statement of the facts accepts Cornwell's version of events where the record shows dispute, and our statement gives to Cornwell all reasonable inferences in his favor. *See United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003).

Electra Central Credit Union (Electra) is a not-for-profit cooperative that provides financial services, including banking and lending, to its members. On August 30, 1993, Electra hired Raymond Cornwell, who is African-American, as its Director of Lending. Cornwell supervised the nine employees who worked in Electra's loan department and managed Electra's lending operations until Cornwell was promoted to Vice President and Chief Operating Officer in 2000. Thereafter, Cornwell managed Electra's branches and cash operations in addition to Electra's lending business.

During Cornwell's stewardship of Electra's lending operations, the value of Electra's loan portfolio grew from just over $65 million in December 1997 to more than $85 million in December 2000. Although the portfolio's value decreased by about four percent, to about $80 million, between December 2000 and December 2001, the record on summary judgment, viewed most favorably to Cornwell, does not suggest that a deficiency in Cornwell's management caused this decrease.

When Cornwell joined Electra, it sold financial products individually. For example, a member who wanted to purchase both a home loan and a checking account would buy the checking account from one of Electra's employees and the home loan from another. In 1999, Electra's management team and its Board of Directors adopted a policy to create a "sales culture," in which each of Electra's front-line employees would be able to sell every product that Electra offered.

Electra's transition to a sales culture was ongoing when, on September 17, 2001, Electra hired Jim Sharp, a Caucasian, as Chief Executive Officer. At his deposition, Cornwell testified that during the early months of Sharp's tenure, Sharp excluded Cornwell from meetings at which the management team discussed issues within the scope of Cornwell's responsibilities as Vice President and Chief Operating Officer. Cornwell also testified by deposition that Sharp had said he would

fire any member of the management team who "goes to the board and doesn't talk to me first about it . . . ."

On November 9, 2001, during a meeting of Electra's management team at Sharp's home, Sharp made comments about women that Cornwell considered "unprofessional" and "close to sexual harassment." Three days later, Cornwell told Bonnie Cottrell, Electra's Vice President of Human Resources, about Sharp's comments. Cornwell said that he thought Sharp's behavior at the meeting should be "dealt with in some fashion," but Cornwell did not explicitly ask Cottrell to investigate Sharp's remarks, and Cottrell did not offer to do so. Nor did Cottrell speak to Sharp about Cornwell's concerns.

In late November or early December 2001, Sharp informed the management team that he intended to reorganize Electra's operations to facilitate the transition to a sales culture, but Sharp did not specify what changes he was considering. Although Sharp discussed his reorganization plans with members of Electra's management team over the next few weeks, Cornwell testified that Sharp did not include Cornwell in these meetings, or notify him about them, even though a reorganization would affect Cornwell's responsibilities and opportunities.

On the afternoon of December 12, Cornwell asked Sharp what organizational changes he planned to make. Sharp said that he intended to create a new management position, Vice President of Sales and Branch Operations; to promote Virginia Hall, a Caucasian, to fill that position; and to reassign responsibility for Electra's branches and cash operations to Hall, who previously had not been a member of Electra's management team. Sharp also said that he intended to eliminate the title of Chief Operating Officer and to change Cornwell's title to Vice President of Lending. As a result of these changes, Cornwell would retain responsibility for Electra's lending operations but lose responsibility for Electra's branches and cash operations and he would manage fewer

employees. Sharp explained to Cornwell that Sharp wanted Cornwell to focus on Electra's lending operations to correct problems with the sales culture and with lending, including the decrease in the value of Electra's loan portfolio. Cornwell asked why he had not been included in the reorganization planning process. Sharp did not answer, but offered to help Cornwell find employment with a different firm in the financial industry if Cornwell did not want to continue working for Electra.[2]

The next day, Sharp announced the reorganization publicly during a management team meeting. Cornwell was the only African American member of the management team, and the only executive whom Sharp demoted. Sharp asked each person at the meeting to commit to support the reorganization. Cornwell felt "blind-sided," "embarrassed," and "humiliated" by Sharp's request that Cornwell publicly endorse his own demotion. Every member of the management team agreed to support the reorganization, except Cornwell, who said that he supported Electra, but not Sharp's "process" or "system."

After this meeting, Cornwell again complained to Bonnie Cottrell about Sharp's behavior at the November 9 meeting, and now also about the reorganization. Cornwell asked Cottrell whether race had played a role in Sharp's decision to demote Cornwell. Cottrell responded that she did not think that race was a factor in Sharp's reorganization process but Cottrell suggested that Cornwell express his concerns to Electra's Board of Directors. The record on summary judgment does not indicate affirmatively that Cottrell investigated Cornwell's concerns about race discrimination.

Soon thereafter, Cornwell spoke to Bob Pearson, a member

---

[2]At his deposition, Sharp testified that he did not tell Cornwell about Sharp's planned reorganization because "I simply knew that he wouldn't agree with me." Sharp also testified that Cornwell was the most qualified of Electra's employees to manage Electra's lending business.

of Electra's Board of Directors. Cornwell told Pearson that he disagreed with Sharp's decision to reassign some of Cornwell's responsibilities to Hall, who was a less experienced executive than Cornwell, but Cornwell did not explicitly accuse Sharp of race discrimination. At Cornwell's deposition, Electra's counsel asked if Cornwell told Pearson that Cornwell thought race had influenced Sharp's decision to demote Cornwell. In response, Cornwell testified:

> No. What I told him was that I was unsure as to what the motives — what motives were driving Jim Sharp, and I asked a question, I don't know if it's the color of my skin, I don't know if it's the fact that he just doesn't like me, I don't know whether it's the fact that I'm a man and not a woman, I said, I'm not sure what's driving him in this situation, I just feel that it's wrong.

Cornwell also told Pearson about Sharp's alleged inappropriate sexual comments. According to Cornwell, Pearson responded that the Board would "investigate" and "find out" Sharp's motives for the demotion.

On February 13, 2002, Cornwell met with Bob Potter, the chairman of Electra's Board of Directors, regarding the concerns Cornwell expressed to Pearson when they met in December. Potter gave Cornwell a memorandum, in which the Board of Directors "ratified" Sharp's reorganization and endorsed Sharp's authority to alter Electra's management structure to improve the credit union's financial performance. This memorandum advised Cornwell that the Board of Directors had instructed Sharp not to discuss personal private or sexual issues with Electra's employees unless there was a business-related reason to do so. Although the memorandum purported to resolve Cornwell's concerns, it did not address in any way Sharp's motivation for demoting Cornwell.

During their meeting, Cornwell and Potter discussed the motivation underlying Sharp's decision to demote Cornwell. Cornwell testified that:

> [Potter] indicated that he did not question [Sharp's] motives. I said, I'm concerned whether the motives are illegal or not. I said, is it because I said something in November about his sexual harassment issues, is it because of the color of my skin, is it because he doesn't like me, and I said all these things to [Potter] direct. [Potter] said, you're raising a different issue now and it's not one that we address here.

Cornwell's provocative questions, viewed in the light most favorable to Cornwell in this summary judgment setting, fairly raised racial discrimination as an issue, and yet the summary judgment record does not show whether Potter or the Board of Directors investigated Cornwell's concerns that Sharp's motivation for demoting Cornwell was illegal. Potter did, however, send Cornwell a letter in June 2002, in which Potter asserted to Cornwell that "[y]our race has never been a factor in any decisions regarding your employment." The letter pointed to Electra's nondiscrimination policy and to Cornwell's conversation with Cottrell in December 2001, in which she too had expressed her opinion that Cornwell's race was not a factor in his demotion.

On May 23, 2002, Cornwell wrote a letter to Potter and the Board of Directors, a copy of which Cornwell sent to Sharp. In it, Cornwell proposed a severance package, including two years' salary. In exchange, Cornwell would "sign a release," presumably absolving Electra from liability for employment discrimination. Cornwell's letter also stated that he had a diary that documented "a pattern of racist and sexist disparate treatment and the creation of a hostile work environment" at Electra.

Cornwell did not intend for the letter to announce his immediate resignation from Electra, but Sharp purported to interpret the letter as Cornwell's resignation. On June 4, 2002, Sharp informed Electra's management team that Cornwell had resigned. Shortly after Cornwell arrived for work on June 5, 2002, Sharp, who testified by deposition that he was surprised to see Cornwell in the office, placed Cornwell on paid administrative leave pending resolution of Cornwell's severance negotiations with Electra's Board of Directors.

Potter attempted to meet with Cornwell regarding Cornwell's severance proposal on June 19, but Cornwell cancelled the meeting because, as he testified, he wanted a lawyer to attend the meeting with him and Cornwell had not yet retained one. That same day, Potter sent Cornwell a letter outlining Electra's settlement offer and suggesting specific times at which Cornwell and Potter could meet before June 25. The letter instructed Cornwell that he had a duty as a management level employee to give the Board of Directors any evidence in his possession regarding employment discrimination at Electra.

On June 21, Potter sent an email to Cornwell in which Potter urged Cornwell again to schedule a meeting with Potter before June 25. The email repeated Potter's demand that Cornwell turn over his evidence of employment discrimination to the Board of Directors. On June 24, Cornwell sent an email to Potter explaining that Cornwell would not be able to meet with Potter before June 25. On July 3, Bonnie Cottrell sent Cornwell a letter terminating his employment at Electra for "actions . . . inconsistent with [Cornwell's] duties as a management level employee . . . ." After the termination of Cornwell's employment, Electra hired Mickey Beard, an African-American woman, as branch manager. Sharp was the "ultimate decision-maker" regarding Beard's employment at Electra.

On May 22, 2003, Cornwell commenced this civil action. On December 10, 2003, the parties and the district court par-

ticipated in a case-scheduling teleconference. During this call, defense counsel announced an intention to file motions for summary judgment and the parties said that they were agreeable to the district court's scheduling trial for the week of June 29, 2004. The district court then inquired whether the parties could complete discovery by December 15, 2003, the scheduled discovery cutoff date. Cornwell's counsel responded that he had "completed discovery." Subsequently, the district court extended discovery for an additional month, after which both Electra and Sharp filed motions for summary judgment and documents in support thereof, including a Concise Statement of Facts.

In his Reply to Defendant's Concise Statement of Facts, Cornwell submitted as a material fact a statement allegedly made by Sharp, referring to one of Electra's African-American employees as "nigger bitch." Cornwell did not offer deposition or affidavit evidence to support the statement. Counsel for the defendants moved to strike the unsupported statement pursuant to Local Rule 56(c)(1), which requires evidentiary support for every "fact" included in a Concise Statement of Facts. Cornwell then moved to reopen discovery to take the deposition of Sharp's former assistant, Karen Smith, who allegedly overheard Sharp make the comment. In support of his motion, Cornwell's counsel offered a declaration stating that Smith told Cornwell's counsel that she had heard Sharp refer to an African-American employee as "that nigger bitch." The declaration also stated that Cornwell's counsel requested that Smith provide an affidavit or declaration recounting Sharp's alleged statement, but Smith declined because she feared that Electra would provide disparaging or otherwise negative employment references. The only other reference in the pretrial record to Sharp's alleged statement occurred during Bonnie Cottrell's deposition on October 1, 2003. Cornwell's counsel asked Cottrell whether she had ever heard Sharp refer to an employee as "that nigger bitch," but Cottrell said she had not. The district court denied Cornwell's

motion to reopen discovery, and granted defendants' motions for summary judgment.

## II

**[1]** We first address Cornwell's contention that the district court erred by denying Cornwell's motion to reopen discovery to take Karen Smith's deposition. We review a district court's order denying a motion to reopen discovery for abuse of discretion. *Panatronic USA v. AT&T Corp.*, 287 F.3d 840, 846 (9th Cir. 2002); *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1161 n.6 (9th Cir. 2001). In this context, "[a] district court abuses its discretion only if 'the movant diligently pursued previous discovery opportunities, and if the movant can show how allowing additional discovery would have precluded summary judgment.' " *Panatronic*, 287 F.3d at 846 (quoting *Chance*, 242 F.3d at 1161 n.6); *Qualls ex rel. Qualls v. Blue Cross of California, Inc.*, 22 F.3d 839, 844 (9th Cir. 1994). We have previously held that a movant did not diligently pursue discovery where he failed to depose a witness during the twenty-seven months between the start of litigation and the discovery cutoff, *Hauser v. Farrell*, 14 F.3d 1338, 1340-1341 (9th Cir. 1994), *overruled on other grounds by Cent. Bank v. First Interstate Bank*, 511 U.S. 164, 173 (1994), where he failed to conduct discovery despite a one month continuance, *Mackey v. Pioneer Nat'l Bank*, 867 F.2d 520, 524 (9th Cir. 1989), and where he "had ample opportunity to conduct discovery," but failed to do so. *Panatronic*, 287 F.3d at 846.

**[2]** Cornwell contends that his attempt to obtain Ms. Smith's affidavit after the discovery termination date excuses Cornwell's failure to do so beforehand. He stresses that Ms. Smith's deposition would have taken less than thirty minutes, and that her testimony would have been highly probative, particularly in light of our opinion describing the racial epithet allegedly used by Sharp as "perhaps the most offensive and inflammatory racial slur in English." *Swinton v. Potomac*

*Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (citing *Merriam-Webster's Collegiate Dictionary* 784 (10th ed. 1993) (internal quotation marks omitted). Cornwell also suggests that his decision to forgo Ms. Smith's deposition and affidavit while discovery was ongoing was reasonable, given that Cornwell thought that he could subpoena Ms. Smith's testimony at trial notwithstanding her reluctance to testify.

We find these arguments unpersuasive. Cornwell must have learned about Smith's allegation before October 2003, because Plaintiff's counsel asked Bonnie Cottrell to verify the allegation during her deposition on October 1. Two months later, however, in December 2003, Plaintiff's counsel told the district court that he had "completed discovery," even though he had neither obtained Ms. Smith's affidavit, nor taken her deposition, despite the potential importance of her testimony.[3] At oral argument, Plaintiff's counsel stated that he chose not to include Ms. Smith's testimony in the pretrial record because he prefers not to disclose his strongest evidence before trial. Assuming that Plaintiff's counsel's decision was an appropriate litigation strategy, notwithstanding the likelihood of a defense motion for summary judgment before trial, it was nonetheless not a diligent pursuit of discovery opportunities within the meaning of *Panatronic*. Finding himself without admissible testimony on this issue, Plaintiff must accept the consequence of his choice not to pursue discovery of Ms. Smith's testimony before the discovery cutoff. Plaintiff's counsel surely knew or should have known that Defen-

---

[3]Although we reject Cornwell's discovery argument due to his failure to demonstrate diligence, we note that evidence of Sharp's use of a racial slur would have weighed strongly against summary judgment. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 n.9 (9th Cir. 2004) ("[A] trier of fact may certainly conclude that, in light of [the defendant's] use of a racial slur, his other abusive remarks to [an employee] were also motivated by racial hostility."); *Mustafa v. Clark County School Dist.*, 157 F.3d 1169, 1180 (9th Cir. 1998) ("[D]iscriminatory remarks are relevant evidence that, along with other evidence, can create a strong inference of intentional discrimination.").

dants' motions for summary judgment would test the factual sufficiency of Cornwell's claims. Cornwell's strategic decision not to preserve Ms. Smith's allegation in the pretrial discovery record does not render the district court's routine enforcement of a discovery cutoff an abuse of discretion. Attempting to secure discovery after a discovery cutoff date does not cure a party's failure to conduct diligent discovery beforehand.

[3] Because discovery problems are presented in every case, and because in many cases discovery must close before a district court can consider dispositive motions with all evidence in hand, district courts need to be able to control or limit discovery in order to advance the progress of their trial dockets. The use of orders establishing a firm discovery cutoff date is commonplace, and has impacts generally helpful to the orderly progress of litigation, so that the enforcement of such an order should come as a surprise to no one. As we have emphasized more generally, "[d]istrict courts have 'wide latitude in controlling discovery, and [their] rulings will not be overturned in the absence of a clear abuse of discretion.' " *California v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998) (quoting *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416-17 (9th Cir. 1987) (second alteration in original)). We decline to limit the district court's ability to control its docket by enforcing a discovery termination date, even in the face of requested supplemental discovery that might have revealed highly probative evidence, when the plaintiff's prior discovery efforts were not diligent. We hold that the district court was well within its sound discretion when it denied Plaintiff's motion to reopen discovery.

## III

We turn to Cornwell's contention that the record demonstrates a genuine issue of material fact regarding his race discrimination and retaliation claims under Title VII, 42 U.S.C.

§ 1981, and Oregon law.[4] "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir. 2002). We do not weigh the evidence or determine whether Cornwell's allegations are true; we determine whether there is a genuine issue of fact for trial. *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996). If a reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that Cornwell is entitled to a verdict in his favor, then summary judgment was inappropriate; conversely, if a reasonable jury could not find liability, then summary judgment was correct. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## A

**[4]** Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1) (2005). A person suffers disparate treatment in his employment " 'when he or she is singled out and treated less favorably than others similarly situated on account of race.' " *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1121 (9th Cir. 2004) (internal quotation marks omitted) (quoting *Jauregui v. City of Glendale*, 852 F.2d 1128, 1134 (9th Cir. 1988)). To establish a *prima facie* case under Title VII, a plaintiff must offer proof: (1) that the plaintiff belongs to a class of persons protected by Title VII; (2) that the plaintiff performed his or her job satisfactorily; (3) that the plaintiff suffered an adverse employment action; and (4) that the plaintiff's employer treated the plaintiff differently than a similarly situated

---

[4]We review a district court's order granting summary judgment de novo. *Delta Savings Bank v. United States*, 265 F.3d 1017, 1021 (9th Cir. 2001).

employee who does not belong to the same protected class as the plaintiff. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[5]

Establishing a *prima facie* case under *McDonnell Douglas* creates a presumption that the plaintiff's employer undertook the challenged employment action because of the plaintiff's race. *See id*. To rebut this presumption, the defendant must produce admissible evidence showing that the defendant undertook the challenged employment action for a "legitimate, nondiscriminatory reason." *Id*. If the defendant does so, then "the presumption of discrimination 'drops out of the picture' " and the plaintiff may defeat summary judgment by satisfying the usual standard of proof required in civil cases under Fed. R. Civ. P. 56(c). *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). In the context of employment discrimination law under Title VII, summary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's race. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

**[5]** The Supreme Court has identified two methods by which a disparate treatment plaintiff can meet the standard of proof required by Fed. R. Civ. P. 56(c). First, a disparate treatment plaintiff may offer evidence, direct or circumstantial, "that a discriminatory reason more likely motivated the employer" to make the challenged employment decision. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Alternatively, a disparate treatment plaintiff may offer

---

[5]The *McDonnell Douglas* framework is also applicable to employment discrimination claims under 42 U.S.C. § 1981. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989), *reversed on other grounds by* the Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071, 1071-72 (1991).

evidence "that the employer's proffered explanation is unworthy of credence." *Id*. Referring to the second method, many of our cases state that a plaintiff may defeat a defendant's motion for summary judgment by offering proof that the employer's legitimate, nondiscriminatory reason is actually a pretext for racial discrimination.[6] *See McGinest*, 360 F.3d at 1123; *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1067 (9th Cir. 2004); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641-42 (9th Cir. 2004); *Wallis*, 26 F.3d at 889-90.

Although some plaintiffs might discover direct evidence that a defendant's nondiscriminatory justification for an employment decision is a pretext, most will not. Defendants who articulate a nondiscriminatory explanation for a challenged employment decision may have been careful to construct an explanation that is not contradicted by known direct evidence. To establish that a defendant's nondiscriminatory explanation is a pretext for discrimination, plaintiffs may rely on circumstantial evidence, which we previously have said must be "specific" and "substantial" to create a genuine issue of material fact.[7] *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998) ("Such [circumstantial] evidence

---

[6]A plaintiff may not defeat a defendant's motion for summary judgment merely by denying the credibility of the defendant's proffered reason for the challenged employment action. *See Wallis*, 26 F.3d at 890; *Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986). Nor may a plaintiff create a genuine issue of material fact by relying solely on the plaintiff's subjective belief that the challenged employment action was unnecessary or unwarranted. *See Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (concluding, despite the plaintiff's claims that she had performed her job well, that "an employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact").

[7]Alternatively, a plaintiff could offer direct evidence of an employer's discriminatory intent, for example an employer's use of a racial epithet. But such evidence would not be direct evidence that the employer's explanation for its employment decision is false; rather a jury could infer from the plaintiff's direct evidence, the racial epithet, that the employer's justification is a pretext.

of 'pretense' must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate on the basis of sex.").

The notion of a required specificity of evidence to defeat summary judgment has some grounding in Fed. R. Civ. P. 56(e) which, in dealing with the form of affidavits submitted opposing summary judgment, requires that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth *specific* facts showing that there is a genuine issue for trial." (Emphasis added.) Thus, we have equated "specific, substantial" evidence with evidence sufficient to raise a genuine issue of material fact under Rule 56(c).[8] *See Wallis*, 26 F.3d at 890.

The Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), supports the principle that a plaintiff may rely successfully on either circumstantial or direct evidence to defeat a motion for summary judgment in a civil action under Title VII. *See Costa*, 539 U.S. at 92 (holding that a plaintiff does not have to produce direct evidence of discrimination to obtain a mixed-motive jury instruction under Title VII, and suggesting that a plaintiff suing under Title VII may prove his or her case using either circumstantial or direct evidence). In *Costa*, the Supreme Court affirmed a decision by an en banc panel of this court in which we held that a district court did not abuse its discretion by giving a mixed-motive jury instruction despite a lack of direct evidence. *Costa*, 539 U.S. at 101. As the Supreme Court confirmed, "di-

---

[8]For example, in *Steckl v. Motorola, Inc.*, 703 F.2d 392 (9th Cir. 1983), we concluded that a plaintiff "failed to produce any specific, substantial evidence of pretext" where the plaintiff "produced *no* facts which, if believed, would have shown pretext and thus tendered an issue for trial." *Id*. at 393 (emphasis added). Similarly, in *Wallis* we said that "when evidence to refute the defendant's legitimate explanation is *totally lacking*, summary judgment is appropriate even though plaintiff may have established a minimal *prima facie* case based on a *McDonnell Douglas* type presumption." *Wallis*, 26 F.3d at 890-91 (emphasis added).

rect evidence of discrimination is not required in mixed-motive cases." *Id.* at 101-02. The Supreme Court explained that "[t]he reason for treating circumstantial and direct evidence alike is both clear and deep rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.' " *Id.* at 100 (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 508 n.17 (1957)). The Supreme Court also observed that circumstantial evidence is routinely used to support criminal convictions, even though a conviction requires proof beyond a reasonable doubt. *See id.* And the Supreme Court noted that "juries are routinely instructed that '[t]he law makes no distinction between the weight or value to be given to either direct or circumstantial evidence.' " *Id.* (quoting 1A K. O'Malley, J. Grenig, & W Lee, Federal Jury Practice and Instructions, Criminal § 12.04 (5th ed. 2000)).

In *McGinest*, we applied *Costa* to the question presented by this appeal: what evidence must a plaintiff alleging disparate treatment offer to survive summary judgment? McGinest alleged that GTE failed to promote him because of his race, and also to retaliate against him for opposing GTE's discrimination, while GTE claimed that it failed to promote McGinest because of a hiring freeze. *See McGinest*, 360 F.3d at 1122-23. Reading *Costa* to require that "circumstantial and direct evidence should be treated alike," we held that McGinest offered sufficient evidence to defeat summary judgment, even though McGinest's evidence was circumstantial. *Id.* at 1122-24. Because the only issue remaining in a disparate treatment case after the defendant has rebutted the *McDonnell Douglas* presumption is "discrimination *vel non*," we said:

> in this case it is not particularly significant whether McGinest relies on the *McDonnell Douglas* presumption or, whether he relies on direct or circumstantial evidence of discriminatory intent to meet his burden. Under either approach, McGinest must produce some evidence suggesting that GTE's failure to

promote him was due in part or whole to discrimina-
tory intent, and so must counter GTE's explanation
that a hiring freeze accounted for its failure to pro-
mote him.

*Id.* at 1123.

**[6]** In view of the Supreme Court's recognition in *Costa*
that circumstantial evidence may be "more certain, satisfying
and persuasive than direct evidence," and *McGinest*'s holding
that a disparate treatment plaintiff can defeat a motion for
summary judgment relying on circumstantial evidence, we
conclude that in the context of summary judgment, Title VII
does not require a disparate treatment plaintiff relying on cir-
cumstantial evidence to produce more, or better, evidence
than a plaintiff who relies on direct evidence. *See Costa*, 539
U.S. at 100 (citation omitted); *McGinest*, 360 F.3d at 1124.

**[7]** Although there may be some tension in our post-*Costa*
cases on this point — several of our cases decided after *Costa*
repeat the *Godwin* requirement that a plaintiff's circumstantial
evidence of pretext must be "specific" and "substantial"**[9]** —

---

**[9]***See Dominguez-Curry v. Nev Transp. Dep't*, 424 F.3d 1027, 1038 (9th
Cir. 2005) (noting that "the district court erred in requiring that Domin-
guez's evidence be both specific and substantial because such a require-
ment only applies to circumstantial, not direct, evidence of discriminatory
motive"); *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir.
2005) (stating that the "distinction between direct and circumstantial evi-
dence is crucial, because it controls the amount of evidence that the plain-
tiff must present to defeat the employer's motion for summary judgment.
Because direct evidence is so probative, the plaintiff need offer 'very lit-
tle' direct evidence to raise a genuine issue of material fact") (footnote and
internal citation omitted); *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th
Cir. 2004) (asserting that "[circumstantial evidence] must be 'specific' and
'substantial' in order to create a triable issue with respect to whether the
employer intended to discriminate on the basis of [a prohibited ground].")
(second alteration in original); *Stegall*, 350 F.3d at 1065-67 (observing
that "[a]lthough . . . the Supreme Court's recent decision in [*Costa*] may
undermine *Godwin* to the extent that it implies that direct evidence is more

this panel may not overturn Ninth Circuit precedents in the absence of "intervening higher authority" that is "clearly irreconcilable" with a prior circuit holding, *see Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc), because that power is generally reserved to our en banc panels. *See Miller*, 335 F. 3d at 899; *United States v. Hayes*, 231 F.3d 1132, 1139-40 (9th Cir. 2000); *United States v. Washington*, 872 F.2d 874, 880 (9th Cir. 1989). Whether or not the precedential weight of *Godwin* has been diminished to any degree by the Supreme Court's decision in *Costa*, or by our decision in *McGinest*, we conclude that Cornwell's evidence is sufficient to create a genuine issue of material fact regarding the motives for his demotion under either the *Godwin* standard which would require "specific" and "substantial" circumstantial evidence of pretext, or the *McGinest* standard, which would not.

**1**

The district court concluded that "Cornwell ha[d] not produced specific and substantial evidence to raise a factual issue that the true reason for his demotion or termination was race discrimination or that the stated reasons were false." We disagree.

Cornwell did not oppose summary judgment by alleging merely that Defendants' justification for Cornwell's demotion was unworthy of credence. Rather, Cornwell offered circumstantial evidence from which a reasonable jury could conclude that Defendants demoted Cornwell because Cornwell is African-American. Cornwell also offered "specific" and "sub-

probative than circumstantial evidence, we agree with the *Godwin* court that Stegall must proffer 'specific' and 'substantial' evidence of pretext to overcome Marathon's summary judgment motion."); *Vasquez*, 349 F.3d at 642 (asserting that "[t]o show pretext using circumstantial evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives").

stantial" evidence that Defendants' explanation for Cornwell's demotion was a pretext for race discrimination. Because Cornwell produced evidence that created a factual question whether his demotion resulted from such discrimination, Defendants were not entitled to summary judgment regarding Cornwell's discrimination claims based on his demotion. *See Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004).

The district court concluded correctly that Cornwell established a *prima facie* race discrimination claim under *McDonnell Douglas*. Cornwell offered proof: (1) that he is African-American, a protected class under Title VII; (2) that he performed his job adequately; (3) that he was demoted, an adverse employment action; and (4) that he was treated differently than similarly situated white employees who were not demoted. *See McDonnell Douglas*, 411 U.S. at 802. As a result, Cornwell was entitled to a presumption that Defendants demoted him because Cornwell is African-American. *See id.*

We also agree with the district court's conclusion that Defendants offered admissible evidence that they demoted Cornwell for a "legitimate, nondiscriminatory" reason, specifically to facilitate Electra's implementation of a "sales culture" in which each of Electra's sales employees could sell any of Electra's products. Defendants point to Sharp's deposition testimony, in which Sharp testified that he transferred responsibility for Electra's branch operations from Cornwell to Virginia Hall so that Cornwell could focus on correcting problems with Electra's lending business, including a four percent decrease in the value of Electra's loan portfolio. This testimony rebuts the *McDonnell Douglas* presumption, and, as a result, the presumption " 'drops out of the picture.' " *Reeves*, 530 U.S. at 143 (quoting *Hicks*, 509 U.S. at 511).

[8] We disagree, however, with the district court's conclusion that Cornwell did not produce sufficient evidence to

create a genuine issue of material fact as to whether Defendants demoted Cornwell because he is African-American. Viewed most favorably to Cornwell, the record would permit a jury's inference that Sharp treated Cornwell differently than Sharp treated white executives because of Cornwell's race. Cornwell, the only African-American member of Electra's management team, was the only senior executive whom Sharp demoted. Cornwell testified by deposition that between Sharp's arrival in September 2001 and Cornwell's demotion in December 2001, Sharp excluded Cornwell from management meetings that involved topics within Cornwell's scope of responsibility.[10] Cornwell also testified that Sharp did not consult with Cornwell about whether to adopt APPRO, a risk management tool, even though Cornwell was responsible for Electra's lending business. While a jury could certainly conclude that Sharp's lack of interaction with Cornwell resulted from Sharp's brusque management style rather than racial animus, a reasonable jury could also infer that Sharp excluded Cornwell from the decision-making process regarding Electra's reorganization for malign or discriminatory purposes.

[9] Likewise, a reasonable jury could infer from the admissible evidence opposing summary judgment that Defendants' explanation for Cornwell's demotion was a pretext for discrimination. Indeed, when Cornwell asked Sharp why Cornwell had not been involved in the reorganization planning process, Sharp's answer was to offer to help Cornwell find a job with a different financial services firm if he was unhappy with Sharp's approach. A reasonable jury might conclude that Sharp's perhaps too ready willingness to help Cornwell leave Electra was in tension with Defendants' justification for Cornwell's demotion. If Sharp truly believed that Cornwell was the best qualified executive to manage Electra's lending business,

---

[10]Cornwell testified by deposition that Sharp held meetings about the reorganization "with Cindy, and Lesly, Virgina, Rob, but none of those was I included in, nor was I even informed that the meetings took place, and yet they were concerning an eventual move or job change for me."

and if Sharp demoted Cornwell to reshape his focus exclusively on lending, as Sharp testified, then a reasonable jury might consider Sharp's eagerness to help Cornwell exit inconsistent, because Sharp did not pursue the alternative of seeking to allay Cornwell's concerns and soften his negative reaction to the reorganization by including him in the decision-making process.

Sharp's decision to promote a less experienced white employee to manage Electra's branch operations could also support a reasonable jury's conclusion that Defendants' explanation for Cornwell's demotion was a pretext for discrimination. The record shows that Cornwell was a valuable member of Electra's business, and that among Electra's executives, Cornwell knew the most about lending. Cornwell was promoted twice during the eight years he worked at Electra, ultimately to Vice President and Chief Operating Officer, with key responsibilities for lending and for branch operations. Cornwell also testified during his deposition that no one at Electra ever suggested to Cornwell that he was performing inadequately, and for summary judgment purposes we credit Cornwell's testimony. Sharp, in his deposition, acknowledged that Cornwell was the best qualified person to lead Electra's lending group, and Sharp testified that he assigned responsibility for Electra's branch operations to Hall, a white employee who was not previously a member of Electra's management team, so that Cornwell could focus on lending. Although a reasonable jury might view Sharp's decision to reassign responsibility for Electra's branch operations from Cornwell to Hall as consistent with Defendants' proffered rationale for Cornwell's demotion, a reasonable jury might also view the disparity between Cornwell's management experience and Hall's as proof that Defendants' explanation for Cornwell's demotion was a pretext for race discrimination. *See Ash v. Tyson Foods, Inc.*, No. 05-379, 2006 WL 386343, at *2 (February 21, 2006) (per curiam) ("Under this Court's decisions, qualifications evidence may suffice, at least in some circumstances, to show pretext."); *see also Raad v.*

*Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003).

If one credits Cornwell's deposition testimony, it would be possible to conclude that Electra never addressed Cornwell's expressed concern that his demotion was the result of race discrimination. Cornwell testified that he asked both Pearson and Potter whether race played a role in Sharp's decision to demote Cornwell. Cornwell told Pearson that Cornwell was "unsure as to what the motives — what motives were driving Jim Sharp . . . I asked a question, I don't know if it's the color of my skin . . . ." Similarly, Cornwell informed Potter that Cornwell was "concerned whether the motives [underlying Cornwell's demotion] are illegal or not . . . . [i]s it because of the color of my skin . . . ?" Cornwell questioned the motives underlying Sharp's decision to demote Cornwell, specifically whether they were tainted by race discrimination. The Board of Directors's response, however, addressed merely Sharp's authority to reorganize Electra's business, which Cornwell never challenged. Cornwell testified that Potter responded to Cornwell's question by saying "you're raising a different issue now [than Sharp's authority to reorganize Electra's business] and it's not one that we address here." Electra never responded to the substance of Cornwell's concern that race discrimination was afoot, apart from Potter's letter stating that Bonnie Cottrell held the opinion that race did not play a role in Cornwell's demotion.[11] The summary judgment record does not indicate affirmatively whether Electra's Board of Directors investigated or evaluated Cornwell's concern that Sharp's actions were racially motivated. A reasonable jury could view Electra's failure to investigate as an attempt to conceal Sharp's illegitimate motives.

---

[11]Potter's reference to Cottrell's opinion does not have a commanding weight in the summary judgment context, given that the record does not indicate affirmatively that Cottrell investigated whether race discrimination motivated Sharp to demote Cornwell.

From the evidence presented on Cornwell's side of the dispute, a rational jury could conclude that Sharp had an aim to force Cornwell out, that Sharp had excluded Cornwell from meetings within his areas of responsibility in order to discourage Cornwell, and that Sharp was, to put it starkly, a CEO who did not want to work with an African-American Chief Operating Officer. The truth might be that all of Sharp's management aims were legitimate and matters of prerogative and personal style. But a jury could also find on the summary judgment record that a discriminatory intention was at work, and in our view Cornwell presented sufficient evidence to place this issue in the jury's province for decision.

**[10]** As the Supreme Court has said: "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255. We hold that Defendants are not entitled to judgment as a matter of law on the issue whether Sharp's demotion of Cornwell offended Title VII's prohibition of intentional racial discrimination.

## 2

The district court concluded that Cornwell did not produce evidence sufficient to create a genuine issue of material fact whether Defendants fired Cornwell because he is African-American. We agree.

**[11]** Cornwell established a *prima facie* case regarding his termination. *See McDonnell Douglas*, 411 U.S. at 802. Defendants then offered admissible evidence that they terminated Cornwell's employment for a legitimate nondiscriminatory reason. Potter, the Chairman of Electra's Board, repeatedly urged Cornwell to schedule a meeting to discuss Cornwell's requests for severance. Potter requested that Cornwell produce any documentation of racial discrimination at Electra.

These were legitimate requests by the Chairman of Electra's Board, and Cornwell disregarded them at his own corporate peril. Defendants adequately rebutted the *McDonnell Douglas* presumption.

**[12]** There was presented striking evidence that the relationship had deteriorated to the point that Cornwell declined to cooperate with Potter's informational requests. By contrast, Cornwell, in opposing summary judgment, did not produce sufficient evidence to create a genuine issue of material fact whether Defendants fired him on the basis of race, rather than because Cornwell would not cooperate with the Board's request for information. Cornwell produced no evidence undermining the credibility of Defendants' explanation that the termination of Cornwell's employment at Electra followed as a result of Cornwell's failure to respond in a timely way to information requests tendered to him from the highest level of the corporation. We hold that the evidence produced by Cornwell does not create a genuine issue of material fact as to whether Defendants fired him because Cornwell is African-American.

**B**

We turn to Cornwell's retaliation claims. Cornwell appeals the district court's order granting summary judgment to Defendants and dismissing Cornwell's retaliation claims under Title VII, and ORS 659A.030, as well as Cornwell's common law wrongful discharge claim under Oregon law.

To establish a *prima facie* case of retaliation, a plaintiff must demonstrate: (1) a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action. *See Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994). We have said that "[c]ausation sufficient to establish the third element of the prima facie case may be inferred from . . . the proximity in time between the protected action

and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). As in disparate treatment actions, a retaliation plaintiff may use the *McDonnell Douglas* framework. *Id.* at 1375. A plaintiff in a wrongful discharge action under Oregon common law must make a similar showing: that his employment was terminated because he resisted discrimination. *Holien v. Sears, Roebuck & Co.*, 298 Or. 76, 90, 689 P.2d 1292, 1299-1300 (1984).

[13] The district court granted summary judgment against Cornwell's retaliation and wrongful discharge claims because the district court concluded that Cornwell did not raise a genuine factual issue whether his complaints to Bonnie Cottrell about Sharp's use of offensive language at Sharp's home party, which Cornwell thought bordered on sexual harassment, caused Cornwell's demotion or his termination. The district court concluded that the record did not contain evidence that Sharp knew about Cornwell's complaint before Sharp demoted him, and thus Cornwell's complaint could not have caused Cornwell's demotion. We agree that Cornwell presented no evidence raising an inference that his demotion was caused by Cornwell's complaint about Sharp's language. Likewise, the district court concluded that the gap between Cornwell's complaint to Cottrell in November 2001 about Sharp's language and Cornwell's termination in July 2002 was too great to support an inference that Cornwell's complaints caused his termination. We agree. Cornwell did not produce evidence warranting a trial on retaliation on either theory.

Cornwell argues that Sharp knew about Cornwell's complaint to Cottrell before Sharp announced Cornwell's demotion on December 13, 2001. Cornwell contends that Sharp's deposition testimony is inconsistent with Potter's with respect to when Sharp learned that Cornwell had complained to Cottrell about Sharp's alleged sexual harassment, and that this inconsistency would permit a reasonable jury to conclude that Sharp knew about Cornwell's complaint before Cornwell's

demotion. Sharp testified that he first learned of Cornwell's complaint during a meeting with Potter in January 2002. But Potter testified that he "must have" mentioned the complaint to Sharp when they spoke in late December 2001. Even if Sharp and Potter recall differently when they spoke about Cornwell's complaint, both Sharp and Potter testified that they discussed Cornwell's complaint after Sharp announced Cornwell's demotion. The congruence of Sharp's and Potter's testimony on this salient point, that their discussion about Cornwell's complaint took place after his demotion, and the absence of any contrary evidence, goes far to scuttle Cornwell's claim that his demotion was retaliatory.[12]

Regarding Cornwell's retaliation claims based on his termination, Cornwell argues that the district court ignored Cornwell's testimony that Sharp threatened to fire any member of Electra's management team who circumvented Sharp to speak directly to the Board of Directors. But the record shows plain and cogent reasons for the termination, communicated by Electra's Human Resources department, in Cornwell's failure to cooperate with the inquiries made by Board Chairman Potter. The termination recited that it was for "actions . . . inconsistent with [Cornwell's] duties as a management level employee . . . ." Cornwell's failure to respond to Potter's inquiries falls into that category and no contrary evidence was submitted raising a genuine issue that the termination was for other reasons.

[14] Cornwell also argues that the district court analyzed the wrong time frame. According to Cornwell, the court

---

[12]Based on deposition testimony that Cottrell's office was adjacent to Sharp's, Cornwell also argues that a reasonable jury could infer that Cottrell told Sharp about Cornwell's complaint. However, Sharp testified that he and Cottrell did not discuss Cornwell's complaint before January 2002, after Cornwell's demotion, and no contrary evidence was submitted opposing summary judgment. In the circumstances of this case, a reasonable jury could not make the proposed inference contrary to the undisputed facts.

should have considered the two or three months between Cornwell's complaint to the Board of Directors in February 2002 and the beginning of Cornwell's paid administrative leave in June, instead of the seven months between Cornwell's initial conversation with Cottrell and the termination letter from Electra. But again, Cornwell has offered no evidence to rebut Electra's evidence that it fired Cornwell because he refused to give the Board of Directors the proof he claimed to possess regarding employment discrimination at Electra. The district court did not err in concluding that too much time had passed between Cornwell's complaints and his eventual termination for a reasonable jury to conclude that Cornwell's complaints caused Electra to fire him. We hold that Electra is entitled to judgment as a matter of law regarding Cornwell's retaliation and wrongful discharge claims.

## IV

[15] We affirm the district court's enforcement of the discovery cutoff. On the summary judgment record as it was presented to the district court, we affirm the grant of summary judgment in part and we reverse the grant of summary judgment in part as specified above. We remand the case for trial on the claim that Cornwell's demotion was the result of intentional discrimination based on race in violation of Title VII.

Each party shall bear its own costs on appeal.

**AFFIRMED** in part, **REVERSED** in part, and remanded.

BEA, Circuit Judge, concurring:

I concur separately as to Part III.A.1. of the opinion[1] because I think the evidence of Sharp's immediate reaction to

---

[1] I join in the remainder the opinion's analysis.

Cornwell's enquiry—an offer to find Cornwell employment elsewhere—can reasonably be seen as contradictory to Sharp's assertion he wanted to have Cornwell remain with the company and be in charge of lending. Hence, the trier of fact can view Sharp's business related reason for re-assigning Cornwell as a pretext, and can then consider racial animus as the true motivation of Cornwell's reassignment or demotion. *See Reeves*, 530 U.S. at 148.

I respectfully disagree with the majority as to the effect of the other evidence it cites as a basis for a finding of pretext or racial animus. Taken alone or together with the evidence of Sharp's said immediate reaction, the fact that (1) Cornwell was a valued employee of Electra who knew the most about lending,[2] (2) was the only African-American executive, (3) was the only executive demoted, or (4) was kept out of meetings where his demotion was discussed does not undermine Sharp's evidence that Sharp wanted to limit Cornwell to lending. Absent some claim of earlier racial discrimination,[3] the fact that Cornwell is the sole African-American and the sole executive to be demoted provides no evidence that he was demoted *because* of his race. Were Cornwell to have been the sole executive promoted, would it lead to the conclusion he was being preferred because of his race? One must distinguish between coincidence and causal effect. To think otherwise

---

[2]If anything, this evidence supports Sharp's proffered rationale that he demoted Cornwell so Cornwell could lead exclusively the lending department. *Ash v. Tyson Foods, Inc.*, No. 05-379, 2006 WL 386343 (February 21, 2006) (per curiam), is inapposite to Cornwell's situation. Sharp did not proffer evidence that he demoted Cornwell because Cornwell had performance problems, or that Cornwell's replacement was better qualified. *See id.* at *3 (stating that part of the employer's defense to claims of disparate treatment was that the plaintiffs-employees had performed poorly in the past). Therefore, Cornwell's qualifications do nothing to discredit Sharp's proffered rationale for demoting Cornwell.

[3]There is none. Additionally, were there such, there is neither claim nor evidence that Sharp had a hand in the hiring which led to Cornwell's singular status.

would tend to insulate Cornwell from adverse action, or explain his advance, solely because of his race.

Similarly, because a person about to be reassigned or demoted is not consulted before the determination is made does not suggest that the reassignment or demotion is being made because of racial animus, dressed up in pretextual reasons. Suppose he were the sole executive promoted, without a prior interview. Would it be evidence that he was promoted because of his race?

When it is unnecessary to grant probative effect to certain evidence, it is necessary not to do so, lest in another case it be cited back to us.