FISHER, Circuit Judge,
dissenting:
I generally agree with much of what my colleagues have to say about extending the principles and jurisprudence developed under Title VII to the context of discrimina: tion against women in colleges and universities under the rubric of Title IX. Ms. Emeldi, however, has not shown that the problems she experienced in her Ph.D. program, and particularly with her supervising faculty advisor, Dr. Horner, were the result of gender discrimination rather than an unfortunate — but not unlawful— breakdown in the academic relationship between a master professor and a graduate student. The record plainly reveals Emeldi’s frustration with her lack of progress on completing her Ph.D. studies and her dissertation, including problems she attributed to Horner as her dissertation chair. She became so frustrated that she finally complained to University administrators. She may have believed these problems and Dr. Horner’s actions were caused by his bias against her as a woman. But this is a retaliation case, where it is critical that she present evidence from which a reasonable jury could find that Horner (a) knew she believed him to be gender biased, and (b) resigned in retaliation because she made such an allegation. She simply has not done so, no matter how sympathetic one might be to her academic disappointments.
We need to be cautious when transporting the doctrines that govern the workplace into the university setting, where the roles of student and teacher, especially in a Ph.D. program, are so bound up in personal interactions and subjective judgments. To turn a falling out between a male professor and a female doctoral candidate into a jury trial over the professor’s alleged bias against women should not happen unless there is good evidence to support the charge of discrimination based on gender. Because Emeldi’s evidence has not met that threshold, I respectfully dissent.
In sum, Emeldi relies almost entirely on her own speculation and eonclusory allegations, without any supporting factual data. I do not believe she has provided sufficient evidence of causation to make out a prima facie case of gender-based retaliation. Even assuming she has made a prima facie case, she has utterly failed to show that Horner’s stated reason for resigning as her dissertation chair — that she had come to view his role as her dissertation chair as “a barrier to her advancement” — had anything to do with her being a woman and was merely a pretext. .
I. Framework
The majority joins the First, Second and Tenth Circuits in applying the Title VII framework to a Title IX retaliation claim. Maj. Op. 1223 & n. 2. I agree that this framework should apply to Title IX retaliation cases arising in the employment context. But extending the employment model wholesale into the teacher-student context — particularly to a graduate school Ph.D. program — is problematic because these contexts differ in significant ways. The academic process involves highly personal, idiosyncratic relationships that depend on various professional qualities. This is especially the case for dissertation chairs and their Ph.D. students, which are not run-of-the-mill relationships between managers and employees. A dissertation chair must have expertise in the student’s area of research as well as be someone with whom the student can work closely, in a process that by its very nature requires the professor to be highly critical of the student’s work and capabilities. The pro *1232 fessor’s role as a dissertation chair is voluntary, unlike a business manager whose very job is to supervise a group of subordinate employees. In agreeing to supervise a student, a dissertation chair enters a relationship where the responsibilities run both ways — the student owes the professor time, intellectual commitment and work product, and the dissertation chair implicitly agrees to provide the same in the form of guidance and critical evaluation. Unlike the relationship between a manager and an employee, each relationship in a Ph.D. program is inherently unique and highly subjective. Of course, this does not mean professors can be permitted to discriminate against students because of their gender or other protected status, but we must be careful not to open them up to claims of discrimination based only on unsubstantiated allegations any time there is an intellectual disagreement about a research project.
Despite these cautions, however, I will accept that we should apply the Title VII framework to Emeldi’s Title IX retaliation claims.
II. Burden-Shifting
To establish a prima facie case of retaliation under Title VII, and hence under Title IX, a plaintiff must prove (1) she engaged in a protected activity; (2) she suffered an adverse action; and (3) there was a causal connection between the two. See Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1108 (9th Cir.2008). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to set forth a legitimate, nonretaliatory reason for its actions. See id. If the defendant sets forth such a reason, the plaintiff bears the ultimate burden of submitting evidence showing that the defendant’s proffered reason is merely a pretext for a retaliatory motive. See Nilsson v. City of Mesa, 503 F.3d 947, 954 (9th Cir.2007).
Without accepting the majority’s reasoning, I will assume that Emeldi has met the first two elements of a prima facie case— that she engaged in a protected activity and suffered an adverse action. She has not, however, shown enough to require a jury to decide whether Professor Horner’s resignation as her dissertation chair was in retaliation for complaints she made against him (and the University) of gender discrimination. I have trouble seeing how her largely subjective and pervasive speculative interpretations of events are sufficient to make a prima facie case of causation. But even assuming she clears that hurdle, I think the University and Horner have established a legitimate, nondiscriminatory explanation for Horner’s resignation and Emeldi’s inability to find a replacement chair, and she has failed to present evidence from which a reasonable jury could find it to be mere pretext. See Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir.2008).
Emeldi complains that Horner resigned as her dissertation chair and also prevented her from finding a replacement so she could complete her PhuD.[1] He did this, she contends, because she sent a memo to University officials that included a criticism of the underrepresentation of women on the faculty, then later complained to other officials that Horner’s treatment of her in class meetings and his supervision of her thesis reflected his own bias against her as a woman. Horner and the University vigorously deny these serious allegations — that Horner was biased against women generally or specifically against Emeldi, and that at the time he resigned he even knew that Emeldi thought he was. The majority concedes this is a close case; *1233 but it concludes nonetheless that Emeldi has shown enough to warrant a jury trial. Maj. Op. 1229-30. I think not. The majority is too generous to Emeldi’s “evidence.” Notably, almost all of her proof of Horner’s gender bias and retaliatory actions is based on her own suspicions and speculation. She may in her own mind have believed her problems were the result of gender bias. The issue, however, is whether Horner was biased, knew she thought that and retaliated against her for saying so. Tellingly, Emeldi has not provided statements from other witnesses who might have corroborated her speculation, particularly on factual issues where one would expect her to have at least tried to find someone who would support her theory of the case. She offers no explanation or excuse — such as faculty or student witnesses who refused to cooperate by providing sworn statements, or the existence of some “code-of-silence.”
I acknowledge that this is a summary judgment appeal, and we give substantial leeway to the plaintiff as the losing party below. Nonetheless, it is well-settled that, “[w]hen the non-moving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact.” Hansen v. United States, 7 F.3d 137, 138 (9th Cir.1993) (per curiam); see also United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1061 (9th Cir.2011) (Gould, J.) (“The evidence adduced by Cafasso establishes only that this set of events could conceivably have occurred; it does not give rise to a reasonable inference that it did in fact occur. To find liability on this evidence would require undue speculation. To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations.”); Head v. Glacier Nw. Inc., 413 F.3d 1053, 1059 (9th Cir.2005) (discussing the “longstanding precedent that conclusory declarations are insufficient to raise a question of material fact”).
Emeldi’s claims come up short for these very reasons. She seeks to blame her failed Ph.D. dissertation effort on her master professor’s gender bias and retaliatory motive, transforming academic judgment calls into a civil rights violation. In this context, I submit there is good reason to insist that the student provide specific and substantial evidence — not just speculation and circumstantial inferences that are not attested to by others and, importantly, are inconsistent with the contemporaneous documentary record.
A brief review of the evidence the majority relies on, and the University’s rebuttal, shows why.
1. May 2007 memo to Bullis. In May 2007, Emeldi wrote a memo summarizing a meeting between several graduate students and Mike Bullis, the Dean of the College of Education. ER 34-35. That memo, under the heading “Recommendations,” listed as one of many topics that had been discussed the following bullet point:
Students request that qualified women be hired into tenured faculty positions [emphasis]. Students attempted and were unable to identify a current female appointment to a tenured faculty position. Students need to experience empowered female role models successfully working within an academic context [emphasis]. Doctoral students request that the college model a balance of gender appointments that reflect the proportion of student gender population ratios.
SER 56 (brackets and bracketed text in original). This paragraph is the keystone of Emeldi’s claim that Horner resigned in retaliation for Emeldi having complained to the University about gender inequality. Horner, however, in uncontradicted testi *1234 mony states that he was never made aware of the contents of Emeldi’s May 2007 memo before he resigned as her - chair, learning its contents only during this litigation. See SER 5-6, 24. Emeldi has provided no evidence of Horner’s actual knowledge of the memo’s contents, particularly the gender issue, before then. At most, she offers only uncorroborated hearsay from an unidentified source that all faculty got copies of the memo and, she says, its contents were “common knowledge.” Maj. Op. 1221.
2. Meeting with Friestad and Bentz. The next critical piece of evidence in Emeldi’s attempt to link Horner’s resignation to gender discrimination is a meeting she had with University administrators Marian Friestad and (possibly) Annie Bentz in October 2007. ER 37.[2] Emeldi says that after there had been no response or followup to her earlier May memo, she arranged the meeting:
regarding what I perceived to be relative lack of academic support and related diminishment of financial support ... to complete my doctoral degree problem. I described one possible cause of that problem as an institutional bias in favor of male doctoral candidates, and a relative lack of support and role models for female candidates. I mentioned the content issues in the Student Advisory Board Memo and my concern about gender inequity of the faculty. I identified the chair of my dissertation committee, Dr. Rob Homer, as being distant and relatively inaccessible to me.
ER 28 (emphasis added). This is the whole of Emeldi’s proof that sex discrimination was discussed and, more importantly, of her supposed allegation of gender bias against Horner. She then theorizes that Friestad told Horner about Emeldi’s allegation, triggering his resignation. Even assuming Emeldi’s ambiguous characterization of Horner as being “distant and relatively inaccessible” was meant as an accusation of gender bias, Friestad certainly did not understand that to be the issue. She denies that sex discrimination was discussed at all, much less any accusations of such against Horner. SER 9 at ¶ 4.
Friestad’s account is supported by a contemporaneous document that further undermines Emeldi’s recollection of the discussion. In connection with the meeting, Emeldi sent Friestad a memo entitled “Reference Information for Requested Conflict Resolution Services,” which chronicled what Emeldi obviously found to be a frustrating history with the Special Education Doctoral program from 2004 to October 2007. See Memorandum dated Oct. 18, 2007, dkt. # 37-3. The memo detailed perceived slights, lack of cooperation or response and some disagreements or “conflicts” with various faculty members, including Horner in his capacity as chair of her dissertation committee and supervisor of her academic work. As the memo’s “Introductory Comments” section states, however, it was “not intended as a criticism of the faculty members discussed. It is intended to describe the series of conflicts that have resulted in communication failures and the events that have contributed to a lack of progress made in my program.” Dkt. #37-3 at 14. Friestad says that was her understanding of what the meeting was about, and reflects the nature of what she and Emeldi actually discussed — “what might best be termed as a series of perceived personality conflicts.” SER 9 at ¶ 4, SER 10. Critically, Friestad states that “Ms. Emeldi did not discuss any issues related to sexual harassment or discrimination. Nor was there any inference [sic] or indication that she was concerned about sexual harassment or dis *1235 crimination in the Memorandum.” SER 9 at ¶ 4. Reading Emeldi’s memo confirms Friestad’s account and understanding.
Although the evidence of a nonmoving party is to be believed, and all justifiable inferences are to be drawn in her favor, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), “evidence in opposition to the motion that clearly is without any force is insufficient to raise a genuine issue,” 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2727 (3d ed. 2011). Emeldi’s “evidence” regarding what took place at the October 19 meeting appears to fall into this category. Even if Emeldi’s claim that gender discrimination was discussed is credited, however, Emeldi offers only speculation that Friestad informed Horner of any charges of discrimination following the meeting.
3. Friestad phone call to Homer. The next critical link in Emeldi’s chain of causation is Friestad’s phone call to Horner sometime after the October 19 meeting. With Emeldi’s permission, Friestad called Horner to discuss Emeldi’s concerns about her lack of progress in the doctoral program, including Horner’s role in the delay. SER 10.[3] Horner acknowledges the phone call “with Marian Friestad in which she informed me that Ms. Emeldi had filed a concern related to her moving forward.” SER 20. Friestad did not share with him the contents of any documents; she “simply told me that there was a concern.” Id. Significantly, Emeldi’s counsel did not ask Horner at his deposition whether Friestad mentioned gender bias. And Friestad, as quoted above, denies that she and Emeldi ever discussed gender discrimination at any of their meetings. SER 8-11. On this record, there is no evidence that Horner understood from the phone call that Emeldi’s “concerns” about her progress and Horner’s role involved gender bias. Equally important, although Horner readily acknowledges that Emeldi’s concerns about him ultimately led to his resignation, he said his decision came only after receiving an email memo from Emeldi on November 12, well after Friestad’s phone call. SER 20-23.
4. Emeldi’s November 2007 memo/ email exchanges with Homer. Horner attributes his decision to resign as Emeldi’s dissertation chair, and his timing, to a November 12 email memo he received from Emeldi, see SER 63-68, “identifying me as a barrier to her advancement and indicating that she was concerned about my unwillingness to move her doctoral committee forward”; “she was significantly concerned that I was a barrier to her advancement. That is not a role I am interested in playing, therefore it seemed that the logical step was for her to work with someone who would be able to promote her objectives. I chose to stop being the chair of her dissertation committee.” SER 21-23.[4] Horner’s description of the lengthy and detailed memo is accurate; and — consistent with Friestad’s account of her initial and subsequent meetings with Emeldi — it contains no suggestion of gender discrimination. Emeldi wrote to Horner, “Though support has been requested, and you have acknowledged my patience in waiting for your involvement, we have, to date, not collaborated to progress my dissertation research forward.” SER 67. She continued, “The extinction plan that’s *1236 been implemented over the last year particularly has prevented me from accessing support in weekly research meetings to progress dissertation prerequisite and project work and from directly communicating, accessing support, and collaborating with you, committee, and other faculty members causing my program to be unnecessarily extended.” Id. On November 19, Horner sent Emeldi the following email in response:
I am sorry you were unable to come to the research meeting today, because I think it is important for us to resolve the issues you frame in your message without delay.... [¶] Your message is clear that you see my feedback as a barrier to your progress, and not helpful in moving your dissertation forward. [¶] I have great respect for your personal and professional judgement and I do not wish to be a barrier to your advancement. [¶] At the same time, I think we have differences in our view of your research plan. [¶] After some serious thought, I believe the most logical move is for you to work with an advisor who is more in tune with your research vision. As such I resign as of today as chair of your dissertation committee.
SER 61-62. Significantly absent from this contemporaneous documentary exchange between Emeldi and Horner (like Emeldi’s memo to Friestad) is any hint of gender discrimination being at issue or having been surfaced. See SER 20-28; see also dkt. #54. Rather, Horner describes the intellectual and interpersonal conflicts that led to his resignation:
Ms. Emeldi developed a dissertation proposal but was dissatisfied with my critiques about the scope and substance of her proposal. In my judgment Ms. Emeldi’s dissertation proposal was insufficiently developed to allow presentation to a dissertation committee. The conceptual foundation was not established, and her methodology would not have met the standards for a doctoral dissertation.
SER 5 at ¶ 2. Horner explains that Emeldi “did not respond well to [my criticisms] .... [S]he resisted my suggestions, and went to University administration complaining that I was an obstacle to her progress.” SER 5 at ¶ 3.
I submit that, even making allowances for Emeldi’s need in some instances to rely on circumstantial evidence, and giving her the benefit of permissible inferences on summary judgment, there is nothing but speculation to supply the vital missing element in Emeldi’s gender discrimination claim: that the cause of and true reason for Horner’s resignation (and his alleged undermining of finding a replacement chair) was gender-based retaliation. Not only do Horner and Friestad deny it, the documents created at the time corroborate them. See Maj. Op. 1228. Nonetheless, leveraging off her disputed complaint about Horner’s gender bias to Friestad, Emeldi now theorizes that Horner’s resignation as her chair had to be because Friestad reported that accusation in her call to Horner. However, when asked why she believed Horner’s resignation was “gender based retaliation,” she candidly— and correctly — replied, “I would be speculating. I think that’s a question for Rob Horner.” SER 53. See Maj. Op. 1230 & n. 8.
The majority, however, believes a jury should decide this question. To justify allowing Emeldi to get that far, it cites three items of “ample circumstantial evidence” to establish causation and pretext. Maj. Op. 1227. The first and “strong” circumstance is the proximity in time between Emeldi’s protected conduct — her assumed complaint of gender discrimination — and Horner’s resignation. Maj. Op. 1226 (citing Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1035 (9th *1237 Cir.2006)). Of course, in Cornwell we held “the record did not contain evidence that Sharp knew about Cornwell’s complaint before Sharp demoted him, and thus Corn-well’s complaint could not have caused Cornwell’s demotion.” Cornwell, 439 F.3d at 1035. Likewise, that is the record here. Emeldi has no evidence that Horner had any idea she was accusing him of gender discrimination.
To close this evidentiary gap, the majority credits Emeldi’s “theory” on appeal of how Horner learned of her supposed gender-bias complaints about him. In her brief to this court, Emeldi speculates that “[ajs soon as [she] left the discussion with Friestad, [Friestad] called Horner and told him that [Emeldi] had accused him of discriminating against her.” Bl. Br. 6. She contends that because of that contact, Horner resigned as her dissertation chair “that very day.” Bl. Br. 23. In fact, events did not move anywhere near that fast.[5] As documented by the record, Horner resigned on November 19, after receiving Emeldi’s long email memo on November 12. See SER 21. As noted above, the Emeldi-Friestad meeting was on October 19, with the Friestad-Horner phone call occurring shortly after. The evidence shows that almost a month intervened between the call and Horner’s resignation, during which time Horner and Emeldi had rather extensive email contacts, providing a contemporaneous documentary record that confirms Horner’s nonpretextual explanation for his resignation.
Regardless of the timeline, Horner does not dispute that he resigned because of Emeldi’s complaints about delays in her dissertation’s progress — as relayed in general terms by Friestad and supplemented by Emeldi’s email memo. But he does dispute — and there is no credible objective evidence to the contrary — that his resignation had anything to do with her being a woman rather than a grad student who had come to view him as a “barrier to her advancement.” SER 21.
The majority tries to bolster Emeldi’s case by citing to Horner’s supposed acts of gender bias “in other contexts,” all of which are anecdotal, based largely on hearsay and unsupported other than by Emeldi’s own accounts. Maj. Op. 1221-22, 1226-27. For example, the majority credits Emeldi’s assertion “that Horner gave more attention and support to male students and that he ignored her and did not make eye contact with her.” Maj. Op. 1227.[6]
The majority also credits Emeldi’s complaint that when she attended Horner’s graduate student group meetings, she was “not on the agenda,” or when she was on the agenda, none of her “substantial/meaningful work” was discussed. Maj. Op. 1227. Once again, there is no proffered testimony of other students or faculty members to give credence to Emeldi’s perceptions that Horner was slighting her (and presumably other women students). The majority excuses this shortcoming because Emeldi “had direct percipient knowledge of what happened at the graduate student group meetings she attended.” Op. at 1229 n. 7. But this misses the point. She and the majority rely on these “facts” to prove Horner’s actual gender-biased behavior — discrimination that took place not in one-on-one dealings between Horner and Emeldi where it would have to *1238 be a “he said, she said” dispute, but in front of many potential witnesses. Summary judgment standards do not require us to turn a blind eye to Emeldi’s failure to make her affirmative case or to rebut the defendants’ nonpretextual explanations with anything other than her own characterizations and perceptions.
This failure is particularly troubling with respect to what the majority invokes as Emeldi’s “specific examples of Horner’s male students being given opportunities that were not available to his female students,” such as access to office space and technology. Maj. Op. 1227. The majority refers only to Emeldi’s declaration; Emeldi cites nothing at all. She describes favorable treatment given to four specified male students, and names a female professor and a female student, both of whom she says complained of “subordinating” and “derogatory” treatment resulting from this disparity. Dkt. #74 at 16-18. She also says these disparities were “observed by doctoral students interviewed for the Student Advisory Board Memo.” Id. at 16. But she does not offer declarations from any of these sources, or any direct evidence of Jason Naranjo’s premature “assistance] to get a tenure-track position,” Scott Ross’ “three office spaces” and “number of palm pilots” or Scott Yamamoto’s “several opportunities to work on research projects.” Id. at 16-17. This evidence, which Emeldi has not bothered to corroborate, is too anecdotal and lacking in specific evidentiary support to raise any reasonable inference that Horner was gender biased and actively discriminated between his male and female students. '
Perhaps the most glaring example of Emeldi’s speculative accusations, credited by the majority as supportive “other evidence” of Horner’s retaliatory intent, Maj. Op. 1227, relates to her inability to secure a replacement chair despite asking 15 faculty members — which she attributes to Horner’s gender-based animus against her. The majority cites Emeldi’s contention that after his resignation, Horner “told other Department faculty members that Emeldi should not be granted a Ph.D., and should instead be directed into the Ed.D. program, which Emeldi says is a less prestigious degree.” Maj. Op. 1222.
Other than Emeldi’s own speculation and hearsay, neither of which can establish a disputed issue of material fact, the evidence that this statement was made is nonexistent. The “evidence” is actually the excerpt of record Emeldi submitted in this appeal (ER 37-38), which in turn is the statement of facts Emeldi submitted in opposition to the University’s summary judgment motion in the district court. There Emeldi stated: “Horner announced to other faculty ... that plaintiff should not be granted a Ph.D. degree but should be directed into a program for the lesser Ed.D. degree. Horner has never discussed that change with plaintiff.” ER 37-38. As support, she cites to her own declaration, in which she alleges, “[there was a] November 27, 2007 faculty meeting in which [Horner] advocated that I obtain a[ ] D.Ed. rather than a Ph.D. ... Professor Cindy Herr described this statement by Horner to me immediately after it occurred, but I had never heard such a suggestion previously from Horner or anyone else.” Dkt. # 54 at 8. Where is the corroboration from Cindy Herr? All we have is a two-page excerpt of Herr’s deposition. See dkt. # 56-2. Nowhere does Herr testify that Horner made these statements, nor does she testify that she told Emeldi that Horner made these statements. Indeed, nothing in Herr’s excerpted testimony refers to the Ed.D. program, a faculty meeting or even Horner at all. Emeldi’s failure to ask Herr to confirm her alleged statement to Emeldi discredits the accusation against Horner as completely unfounded and certainly not “material to Emeldi’s retaliation claim.”
*1239 I am sympathetic to the majority’s belief that the University could have done more for Emeldi in helping her find a replacement. See Maj. Op. 1222. That does not establish gender discrimination as the motivation for Horner’s actions or the University’s shortcomings, however. To posit, as the majority does, that she was unable to secure a replacement chair because Horner “poisoned” his colleagues against her is simply not credible on this record. Maj. Op. 1227. Not only has Emeldi failed to support Herr’s alleged statement, she has presented no evidence from (or about) any of the 15 faculty members she asked, or from anyone else, suggesting that Horner did anything to dissuade them from acting as her chair. Rather, emails she placed in the record show that those she asked declined for a number of legitimate reasons: they did not believe they had the appropriate specialization to oversee her research; they were already overextended with other projects; they were ineligible to serve as chairs due to University policies. One was hesitant to make a commitment due to health issues. One had moved to Kansas. Another was retired. See dkt. # 48 at 16-26. Further, these emails show that many of the faculty members offered to meet with her to discuss her project, and then wished her well when they determined they were unable to serve as her chair. Some referred her to other faculty members, and several volunteered to serve on her dissertation committee. These are not responses one would expect from colleagues who had been “poisoned.” And equally notable, as the majority concedes, “the record does not disclose why, despite unsuccessfully soliciting fifteen faculty members, Emeldi overlooked two professors who, the University says, were qualified and available to replace Horner as Emeldi’s dissertation chair.” Maj. Op. 1280.
Finally, the majority uses Horner’s earlier praise for Emeldi’s work as evidence that his explanation for resignation is pretextual. See Maj. Op. 1227. To do so seems a pure Catch 22. Had Horner never praised Emeldi, undoubtedly she (and the majority) would cite that as evidence of his longstanding, persistent gender bias. Horner praised Emeldi’s work at various points in their relationship, but he also critiqued her work, as the majority itself notes. See Maj. Op. 1222 n. 1, 1227 n. 5. One would expect nothing less from a dissertation committee chair. Part of the chair’s role is to offer the student advice and criticism on her dissertation’s weaknesses as well as strengths, as well as on her own academic performance. That Horner did just that does not show that his stated reason for resigning as her ad-visor after she told him he was “a barrier to her advancement” was pretextual. SER 21.[7]
In sum, Emeldi’s case should fail because she has not shown enough to warrant a jury’s finding causation. But even if we give her the benefit of doubt on that requirement, she certainly has not shoum enough to rebut as mere pretext Homer’s reason for resigning as her dissertation chair. The evidence, including Friestad and Horner’s testimony and Emeldi’s own documented complaints, makes it clear that Horner’s nondiscriminatory explanation was genuine: he resigned as disserta *1240 tion chair because of intellectual and interpersonal incompatibilities with his Ph.D. candidate. Emeldi’s unsupported statements and speculation do not overcome this evidence, and she has not offered corroborative evidence that was available to her that would create triable issues of causation and pretext. We should not allow this ease to go forward.
Title IX’s worthy antidiscrimination objectives notwithstanding, to let Ms. Emeldi’s claims go to a jury will serve only as a precedent-setting example of how little it takes to turn a failed supervisory relationship between a professor and his Ph.D. candidate into a federal case of gender discrimination. The district court properly granted summary judgment. I respectfully dissent.

. The majority’s characterization of Horner as having ' 'poisoned his colleagues against her,” Maj. Op. 1227, is especially hollow on this record. See pp. 1238-39, infra.

. Neither party has submitted a declaration from Bentz.

. Friestad asked Emeldi "at multiple points, including at the end of the meeting, if she wanted [her] to contact Dr. Horner and discuss her concerns about her progress in the doctoral program. Ms. Emeldi gave [her] permission to do so.” SER 9-10 at ¶ 5.

. He noted that though he "chose to stop being the chair of her dissertation committee,” SER 23, he "stayed as her program advisor." SER 21.

. Emeldi’s counsel’s willingness to exaggerate the documented facts undermines the credibility of counsel and his client.

. The majority cites only Emeldi’s own speculative statement of facts in opposition to the University's motion for summary judgment, ER 36, and her statements in the Notice of Grievance, dkt. # 53 at 27-28, which she filed against Horner on January 16, 2008, two months after his resignation.

. In his declaration, Horner describes criticism he gave Emeldi leading up to his resignation: “In my judgment Ms. Emeldi’s dissertation proposal was insufficiently developed to allow presentation to a dissertation committee. The conceptual foundation was not established, and her methodology would not have met the standards for a doctoral dissertation. I pointed these and other issues out to her in a memo I wrote to her on September 7, 2009____I informed her that she was not yet ready to call her dissertation committee together because her proposal was not yet functional.” SER 5 at ¶ 2.